UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES | ) |
| | ) |
| v. | ) |
| | )   Criminal No.: 10-10159-PBS |
| ROBERT EREMIAN, | ) |
| DANIEL EREMIAN, | ) |
| RICHARD SULLIVAN, and | ) |
| TODD LYONS, | ) |
| Defendants. | ) |
| | ) |

## JOINT MOTION TO DISMISS COUNTS 277 TO 343 OF SUPERSEDING INDICTMENT AND INCORPORATED MEMORANDUM OF LAW

NOW COME the Defendants Todd Lyons and Daniel Eremian and hereby move

this Honorable Court to dismiss Counts 277 to 343 of the Superseding Indictment

because Title 31 U.S.C. §5363(3) (Unlawful Internet Gambling Enforcement Act)

violates the fair notice requirement of the Due Process Clause of the United States

Constitution and as a matter of public policy where it contravenes the General Agreement

on Trade in Services ("GATS").  In support thereof, the Defendants state the following:

## I.  BACKGROUND

Defendants are charged with 67 counts (Counts 277-343) of accepting financial

instruments, specifically, checks, payable at and through any financial institution, for

unlawful Internet gambling, in violation of Title 31 U.S.C. §5363(3), the Unlawful

Internet Gambling Enforcement Act, ("UIGEA") (codified at Title 31, Sections 5361-67

of the United States Code), which was signed into law on October 23, 2006, as a last-

minute attachment to an unrelated bill, the Safe Port Act.  *See* Note, L. Boikess, *The*

*Unlawful Internet Gambling Enforcement Act of 2006: The Pitfalls of Prohibition*,

1

Legislation and Public Policy, Vol. 12:151, at pp. 169-170.  (See Exhibit 1, attached

hereto).   The Act's purpose was to block "unlawful Internet gambling" by prohibiting

any "person engaged in the business of betting or wagering" from knowingly accepting

payment "in connection with the participation of another person in unlawful Internet

gambling."   *See* 31 U.S.C. § 5363.  The Act also required financial institutions and

payment processors to take certain steps to block "unlawful Internet gambling".  *See* 31

U.S.C. § 5364.

The Secretary of the Department of the Treasury (the "Treasury") and the Federal

Reserve System's Board of Governors (the "Board") (collectively, "the Agencies") were

charged with implementing regulations for compliance within 270 days of the Act's

enactment, in consultation with the Attorney General.  *See* 31 U.S.C. §5364(a).

Compliance with the Act has been delayed well beyond this original time frame,

first to December 1, 2009, and, more recently, to June 1, 2010.   A key reason for the

delay in compliance as recognized by the Treasury and the Board is the Act's failure to

provide a clear definition of "unlawful Internet gambling":

> The Agencies have received letters in support of the petition [to extend the
> compliance date] from regulated financial institutions, associations
> representing regulated financial institutions, and members of Congress.
> Some of these commenters assert that the compliance date of December 1,
> 2009 will not be achievable for many regulated entities despite their good-
> faith efforts to achieve full compliance.  Commenters express concern that
> the Act and the final regulation do not provide a clear definition of
> "unlawful Internet gambling," which is central to compliance.  In addition,
> certain members of Congress acknowledged that the Act does not contain
> a clear definition of "unlawful Internet gambling" and expressed an intent
> to consider legislation that would allow problematic aspects of the Act to
> be addressed.

(*See* Federal Register/Vol. 74, No. 229/Tuesday, December 1, 2009/Rules

and Regulations, pp. 62687-62688, a copy of which is attached hereto as Exhibit

2).

Acknowledging the "challenges regulated entities are experiencing with the Act's

definition of "unlawful Internet gambling," as well as the interest of "several members of

Congress in revising the Act," the Agencies allowed a six month extension for "regulated

entities" to address issues related to the definition of "unlawful Internet gambling" and

set June 1, 2010 as the compliance date for the final regulation, almost four years after

the passage of the Act.  *Id*. at 62688.

## II.  ARGUMENT

**A.**     **UNITED STATES CODE, TITLE 31, SECTION 5363 FAILS TO COMPLY WITH THE FAIR NOTICE REQUIREMENT OF THE DUE PROCESS CLAUSE, REQUIRING THAT COUNTS 277 THROUGH 343 OF THE SUPERSEDING INDICTMENT BE DISMISSED.**

### *The fair notice requirement of the Due Process Clause*.

"…[T]he Due Process Clause demands that criminal statutes describe each

particular offense with sufficient definiteness to give a person of ordinary

intelligence fair  notice that his contemplated conduct is forbidden.  A statute must

give fair warning, in language that the common world will understand, of what the

law intends to do if a certain line is passed. The underlying principle is that no man

shall be held criminally responsible for conduct which he could not reasonably

understand to be proscribed." *United States v. Hussein*, 351 F.3d 9, 13 (1st Cir.

2003), quoting *United States v. Harriss*, 347 U.S. 612, 617 (1954) and *McBoyle v.*

*United States*, 283 U.S. 25, 27, (1931) (internal quotation **marks**, citations

omitted).

3

The First Circuit has explained the concept of the fair notice requirement of the federal Constitution's Due Process Clause in the following way:

> A **criminal** statute *fails* to provide fair notice if a "person of ordinary intelligence," *Harriss,* 347 U.S. at 617, "examining [only] the language of the statute," *Colon-Ortiz*, 866 F.2d at 9, would be in some way surprised that it prohibited the conduct in question. "It is not enough," we have explained, for the true meaning of the statute "to be apparent *elsewhere*," in extra-textual materials such as legislative history or analogous statutes. Id. (emphasis added). The idea is that ordinary individuals trying to conform their conduct to law should be able to do so by reading the *face* of a statute -- not by having to appeal to outside legal materials. At the same time, the person of ordinary intelligence is also a person of common sense, with knowledge of **"common understandings** and practices," *Jordan v. De George*, 341 U.S. 223, 232, 95 L. Ed. 886, 71 S. Ct. 703 (1951) (citation omitted), which he brings fully to bear in "examining the language of the statute."

*Sabetti v. DiPaolo*, 16 F.3d 16, 17 (1st Cir. 1994) (Breyer, C.J.), *cert. denied*, 513 U.S. 916 (1994).

Defendants contend that Section 5363 fails to give fair notice of what constitutes "unlawful Internet gambling", in violation of the Due Process Clause of the Fourteenth Amendment.  Specifically, 31 U.S.C. § 5363(3), states:

> No person engaged in the business of betting or wagering may knowingly accept, in connection with the participation of another person in unlawful Internet gambling—
>
> > (3) any check, draft, or similar instrument which is drawn by or on behalf of such other person and is drawn on or payable at or through any financial institution;

Section 5362 defines the term "unlawful Internet gambling":

(10) UNLAWFUL INTERNET GAMBLING.--

(A) IN GENERAL.--The term 'unlawful Internet gambling' means to place, receive, or otherwise knowingly transmit a bet or wager by any means which involves the use, at least in part, of the Internet where such bet or wager is unlawful under any applicable Federal or State law in the State or Tribal lands in which the bet or wager is initiated, received, or otherwise made.

Thus, the Act does not itself outlaw internet gambling, "but rather incorporates other Federal or State law related to gambling." *Interactive Media Entertainment v. Attorney General*, 580 F.3d 113, 116 (3rd Cir. 2009). In so doing, Section 5363 *expressly does* that which the First Circuit has held to violate the due process concept of fair notice, that is, to determine whether the bet or wager is unlawful, "ordinary individuals trying to conform their conduct to law," must go beyond the *face* of the statute – and "appeal to outside legal materials."

This consultation of outside legal materials is no small task; in the case of Section 5363, those "outside legal materials" required to determine whether Internet gambling is lawful or unlawful would arguably be the gambling laws of the fifty States, as well as federal laws, which pertain to "such issues as *who* (minors, residents, insiders, public officials, licensed or unlicensed operators, convicted felons) *is engaging in what conduct* (games of chance, amateur sports, professional sports, horse racing, dog racing, lotteries), *where* (on location, in the same state, across state lines, across international boundaries, in the air, on rivers or at sea, on reservations), *and when* (after hours, Sundays, holidays,

before or during events being wagered on).1

Given the First Circuit's analysis of due process and the fair notice

requirement, the Third Circuit's holding in *Interactive Media v. Attorney General*, *supra*,

580 F.3d at 116, that the Act was not unconstitutionally vague for incorporating "other

Federal or State law related to gambling," and holding that "a reasonable person of

ordinary intelligence would consult the incorporated provisions," *id*. at 116, citing *United

States v. Iverson*, 162 F.3d 1015, 1021 (9th Cir. 1998), cannot be reconciled with the First

Circuit's analysis of what constitutes fair notice in a criminal statute under the Due

Process Clause.  *See Sabetti, supra*, 16 F.3d at 17.

Nor can the Third Circuit's holding be reconciled with the Federal Reserve's and

Treasury's decision to delay financial institutions' compliance with the Act to June 1,

2010, *more than three years* after the Act's passage.   This decision was based on a

public outcry from financial transaction providers, who expressed concern that the Act's

failure to adequately define the term "unlawful Internet gambling," made compliance

with the Act extremely difficult.

For example, in testimony before the Subcommittee on Domestic and

International Monetary Policy, Committee on Financial Services, U.S. House of

Representatives, Mr. Wayne Abernathy, on behalf of the American Bankers Association,

made the following statement about the UIGEA and the Federal Reserve Board and

Treasury's Proposed Rule for compliance:

---

1  See Exhibit 3, Testimony of Wayne Abernathy before the U.S. House of Representatives, on behalf of
the American Bankers Association, at pp. 9-10 (discussing the complicated problems in the UIGEA
regarding what is unlawful versus lawful Internet gambling) (emphasis added).

ABA believes that the flaws in the definition of "unlawful Internet gambling" are fatal to this proposal as a legal, policy, and practical matter. What banks are required to do under the Act relates to and is derived from actions that constitute "unlawful Internet gambling." It is the reference point from which all bearings are to be taken. *A unified, practically workable definition of "unlawful Internet gambling" must be included in either the statute or in the implementing regulations.* Without such a clear reference point it is impossible for banks to know where to land for a successful implementation of the statute. Moreover, given its central role, an appropriate definition of "unlawful Internet gambling" would require at the least a re-proposal of implementing regulations.

> *To begin with, "unlawful Internet gambling" is too vague a term by itself to be operationally useful.* As drafted, s __ 2(t) of the Proposed Rule does not narrow the uncertain breadth of the term as used in the Act. This means that the regulation retains all of the complicated problems in the statute regarding what is unlawful versus what is lawful Internet gambling.

(See Testimony of Wayne Abernathy, ABA, April 2, 2008, at pp. 9-10, attached hereto as

Exhibit 3)(emphasis added).

Mr. Abernathy's sentiments echoed those of Mr. Leigh Williams, the President of

BITS, the technology division of the Financial Services Roundtable, a national

association representing 100 of the largest integrated financial services companies, who

had testified a year earlier before the same committee:

> **We are very concerned that the definition of "unlawful Internet gambling" is so vague that participants in designated payment systems will be unable to determine how to comply with the proposed regulations. Without clarity, this could impose a significant burden on financial institutions to determine what is legal versus illegal.**

(See Leigh Williams' testimony before the U.S. House, April 2, 2007 (emphasis added),

a copy of which is attached hereto as Exhibit 4).

In 2008, the House Financial Services Committee reported legislation (H.R.

6870), which would have *required* that the Treasury Department, along with the Board of

Governors of the Federal Reserve, define "unlawful Internet gambling" prior to finalizing

a regulation.  (See letter to Secretary of Treasury, the Honorable Timothy Geithner, from certain Members of Congress dated September 25, 2009, a copy of which is attached hereto as Exhibit 5).

It is significant that the parties cited above who seek clarification of the term "unlawful Internet gambling" for compliance with the Act, are arguably, given their professional positions, individuals with more than "ordinary intelligence" - and yet, they candidly admit that *they* cannot determine what the law proscribes.

It is equally significant that *lawful* Internet gambling exists; the term "unlawful Internet gambling" is neither all-encompassing, nor intuitive.  In a comment to the Treasury and Federal Reserve Board on the Agencies' Proposed Rule to implement the UIGEA, the Financial Services Roundtable, *see infra*, observed that the term "unlawful Internet gambling" exempts certain forms of gambling, including intrastate, tribal and horseracing transactions, see subsections 5362(10)(B, C & D), but *"does not mention the entire population of lawful Internet gambling"*.  The Roundtable further noted:

> The Agencies [the Treasury and Federal Reserve Board, charged with implementing the regulations] did not refine this definition [of "unlawful Internet gambling"] because the Act focuses on payment transactions and relies on prohibitions on gambling contained in other statutes…Further, applications of some of the terms used in the Act may depend significantly on the facts of specific transactions and could vary according to the location of the particular parties to the transaction or based on other factors unique to an individual transaction.

(See Letter to Treasury Department and Federal Reserve Board from the Financial Services Roundtable, at p.2 (emphasis added) & n.2, attached hereto as Exhibit 6).

A recent bill, H.R. 2267, proposed in the House of Representatives to amend the UIGEA of 2006, acknowledges that internet gambling is lawful in many countries, and

that some form of gambling is lawful in nearly every State:

> (1) Since the development of the Internet, millions of people have chosen to gamble online, and today  Internet gambling is offered by operators located in many different countries under a variety of licensing and regulatory regimes;2
>
> (2) Despite the increasing use of the Internet for gambling by persons in the United States, there is no Federal or State regulatory regime in place to protect United States citizens who choose to engage in this interstate activity, or to oversee operators to establish and enforce standards of integrity and fairness.
>
> (3) In the United States, gambling activities, equipment, and operations have been subject to various forms of Federal and State control, regulation, and enforcement, with some form of gambling being permitted in nearly every State and by many Indian tribes;

(See H.R. 2267, the "Internet Gambling Regulation, Consumer Protection, and

Enforcement Act", [Report No. 111-656, Part I], at pp. 3-4, a copy of which is

attached hereto as Exhibit 7).

The testimony of Mr. Wayne Abernathy, *see infra*, n.2, at p. 10, perhaps

best sums up the problem:

> The regulations, not specifying which transactions qualify as 'unlawful Internet gambling,' point those affected by the law to 'underlying substantive State and Federal gambling laws and not…a general regulatory definition' to determine the scope of what unlawful Internet gambling comprises.  This is a judicial function that banks are not qualified to fill….The vagaries of what constitutes "unlawful Internet gambling" cannot be resolved by passing the burden on to the banking industry.

Nor should that burden be passed along to the Defendants, nor to any other person

of "ordinary intelligence" who seeks to determine the true meaning of the statute and the

---

2  In fact, it is alleged that the Defendants, at all times relevant hereto, were operating Sports Offshore in Antigua.

conduct it prohibits.  (Exhibit 3).

Accordingly, because the Act fails to adequately define the term "unlawful Internet gambling", and instead requires parties to consult with other State and Federal laws to determine what constitutes that crime, Section 5363 failed to provide fair notice to the Defendants, in violation of their rights to due process under the Fourteenth Amendment, such that dismissal of Counts Two Hundred Seventy Seven through Three Hundred Forty Three of the Superseding Indictment is required.

**B.      BECAUSE UNITED STATES CODE, TITLE 31, SECTION 5363 VIOLATES THE UNITED STATES' OBLIGATIONS UNDER THE GENERAL AGREEMENT ON TRADE IN SERVICES (GATS), COUNTS 277 THROUGH 343 OF THE SUPERSEDING INDICTMENT SHOULD BE DISMISSED AS A MATTER OF PUBLIC POLICY.**

Pursuant to the General Agreement on Trade in Services ("GATS"), the United States has a commitment to grant full market access to gambling and betting services. (See Note, Boikess, L. supra, at p. 186, attached hereto at Exhibit 1).  The World Trade Organization ("WTO") Appellate Body has found that certain federal laws were inconsistent with the U.S. commitment of specific market access because they prohibited one, several, or all means of cross-border delivery of Internet gambling.  *Id*., citing WTO, Report of the Appellate Body, n. 224.   The UIGEA would similarly violate this commitment, since foreign websites would not be able to legally access the American market.  *Id.*

While the Government could argue that the Act falls under the GATS exception for public morals, the exceptions in the Act for intrastate, intra-tribal, and interstate horseracing transactions in the online gambling industry, see §§5362(10)(B, C, and D), weaken the "public morals" argument.   Notwithstanding that WTO decisions are not

binding on the United States, nor on this Court, *see Corus Staal BV v. Dep't of Commerce*, 395 F.3d 1343, 1348 (Fed. Cir. 2005), the Defendants respectfully submit that Counts 277 through 343 of the Superseding Indictment, relating to §5363, should be dismissed as a matter of public policy.

## C.   COUNTS 277 TO 343 ARE UNCONSTITUTIONALLY MULTIPLICITOUS.

"An indictment is multiplicitous and in violation of the Fifth Amendment's Double Jeopardy Clause if it charges a single offense in more than one count.  The dangers posed by a multiplicitous indictment are that a defendant may suffer multiple punishments for the same offense, and that the jury may be prejudiced by the appearance that the defendant has committed more crimes than the evidence supports."  *United States v. Goldberg*, 913 F.Supp. 629, 631 (D.Mass. 1996) (citations omitted); *United States v. Brandon*, 17 F.3d 409, 422 (1st Cir. 1994); *United States v. Kushner*, 256 F.Supp. 109, 112 (D. Mass. 2003).   When the same statutory offense is charged as multiple counts, as in Counts 277 through 343 charging the Defendants with violation of 31 U.S.C. 5363, the issue becomes whether Congress intended the counts to constitute separate units of prosecution. *See United States v. Handakas*, 286 F.3d 92, 98 (2d Cir. 2002), *cert. denied*, 154 L.E.2d 160, citing *Bell v. United States*, 349 U.S. 81, 82-83 (1955).  If congressional intent is unclear, "the ambiguity should be resolved in favor of lenity,"; "doubt will be resolved against turning a single transaction into multiple offenses." *Handakas, supra*, 286 F.3d at 98, citing *Bell, supra*, 349 U.S. at 84.

The Government has charged Defendants with sixty-six counts of accepting financial instruments for unlawful internet gambling over the course of three years from nine different banks.  It is not clear from the Congressional record as attached hereto what the individual unit of prosecution should be.  It could be the acceptance itself.  *See United States v. Davenport*, 929 F.2d 1169, 1172 (7th Cir. 1991), *cert. denied*, 502 U.S. 1031 ("We conclude that the structuring itself, and not the individual deposit, is the unit of the crime.").  It could also be the taxable year as with other violations of Title 31.  It could also be based upon the financial institution or the individual transferring the funds.  As the Seventh Circuit has observed in relation to structuring charges:

> The government's position leads to the weird result that if a defendant receives $10,000 and splits it up into 100 deposits he is ten times guiltier than a defendant who splits up the same amount into ten deposits.
>
>       *       *       *
>
> Unable as we are to say that a defendant's conduct is more dangerous the greater the number of deposits, we are unable to construct any rationale for the government's position.

*Davenport, supra*, 929 F.2d at 1171.  Here, the same can be said where the transactions are not tied to any specific gambling transaction and may represents debts accruing over a significant period of time.  Accordingly, this Honorable Court is respectfully urged to dismiss any and all counts it deems to be

multiplicitous.3

### III.  CONCLUSION

Based on the foregoing arguments and authorities, this Honorable Court is respectfully urged to dismiss Counts Two Hundred Seventy Seven through Three Hundred Forty Three on grounds that the Unlawful Internet Gambling Enforcement Act of 2006, and specifically §5363, violate due process and public policy and/or to find that charging multiple counts for the same offense is unconstitutionally multiplicitous and dismiss so much of the counts as the Court deems necessary to comport with Congressional intent.

Respectfully submitted,
TODD LYONS,
By his attorney,


_____
Peter Charles Horstmann, Esquire
B.B.O. 566377
PARTRIDGE, ANKNER & HORSTMANN
200 Berkeley Street, 16th Floor
Boston, Massachusetts 02116
Tel. (617) 723-1980

DANIEL EREMIAN
By his attorney,

  /s/ Thomas J. Butters

---

3The Government's motivation in this case for unbundling hundreds of money laundering and structuring counts is questionable, although the specificity is appreciated.  The excessive number of counts will serve only to increase the Defendants' Special Assessments if convicted.

Thomas J. Butters
Matthew D. Thompson
BUTTERS BRAZILIAN LLP
One Exeter Plaza
Boston, Massachusetts 02116
(617) 367-2600

## **CERTIFICATE OF SERVICE**

I, Peter Charles Horstmann, Esquire hereby certify that on January 3, 2011, the above document was sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this date.

_____
Peter Charles Horstmann

14