UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

_____

| | |
|---|---|
| UNITED STATES | ) |
| | ) |
| v. | ) |
| | ) Criminal No.: 10-10159PBS |
| TODD LYONS | ) |
| _____) | |

**DEFENDANT LYONS' MOTION TO SUPPRESS EVIDENCE SEIZED
FROM 192 HALE STREET,  AN AUDI, A LAPTOP AND LYONS' PERSON
AND INCORPORATED MEMORANDUM OF LAW**

NOW COMES the Defendant, Todd Lyons,  ("Lyons"), through counsel, and hereby

moves to suppress all evidence seized as a result of unsigned search warrants executed on

January 4, 2006, search warrants executed on February 9, 2009, an arrest warrant for Lyons

dated May 6, 2010, and pursuant to a search warrant for Lyons' laptop dated September 10,

2010.  It is resentfully submitted that all evidence seized pursuant thereto was seized in violation

of Lyons' Fourth Amendment rights.  In support thereof, counsel states the following:

**I.  BACKGROUND**

A.    **OVERVIEW**

On or about 2005, Massachusetts law enforcement authorities began an investigation of

gambling activity which was named "Operation Seven Breads".  This Operation focused

primarily on the activities of Richard Settipane and John Demarkis and the numerous individuals

and entities with whom they had gambling relationships.  The investigation revealed that

Settipane had contacts with several off-shore companies that engaged in sports betting activities

including Sports Off-Shore, ("SOS").  This operation resulted in dozens of arrests in 2006 and

convictions in both state and federal court. *See United States v. Settipane & Demarkis,* Docket

No. 07CR10037EFH (D.Mass. 2007)(17 Count Superseding Indictment charging a conspiracy from January 1, 2004 to January 3, 2006 that illegally received $4,000,000 in taxable wagers, money laundering and tax evasion)1.

As part of 23 search warrants executed on January 4, 2006, involving Settipane, Demarkis, Lyons and others, the State Police recovered alleged gambling records and cash from 192 Hale.  Oddly, none of the search warrants were signed until January 5, 2006, despite the contention that the application was signed on January 4, 2006.  All of the search warrants including 192 Hale, the Audi and Lyons were allegedly based upon the Affidavit of Massachusetts State Trooper Pasquale Russolillo, ("Russolillo"), which was signed on January 4, 2006.  (See Exhibit 1, attached hereto).  Despite the 2006 search, Lyons was not charged until May of 2010.  This only occurred after another search of 192 Hale in February of 2009.  The apparent reason for this delay was the ongoing investigation of SOS.  It is alleged that Lyons and his three codefendants all worked for SOS in various capacities.  With respect to Lyons, it is alleged that he collected and paid gambling debts for SOS in Massachusetts and transferred the proceeds to SOS.

B.   **THE WIRETAPS**

On October 12, 2005, the Essex County District Attorney's Office obtained authorization to intercept telephone communications from Massachusetts Superior Court Justice Richard Welch as part of an ongoing sports gambling investigation.  (See Exhibit 2, attached hereto).  Subsequent extensions of this authorization were obtained on October 26, 2005, November 9,

---

1Settipane and Demarkis were not charged with RICO as in the instant case and ultimately entered into Plea Agreements and received sentences that did not include any federal prison time.

2005, November 23, 2005, December 8, 2005 and December 21, 2005 and was expanded to

include additional telephones.  (See Exhibits 3-7, attached hereto).  The last two applications

contained allegations regarding Lyons activities.  The December 8, 2005 and December 21, 2005

renewed authorizations permitted law enforcement authorities to intercept communications over

(781) 526-0591, which was said to be used by Lyons, but which contained no subscriber

information.  (Exhibits 6 & 7).2

## C.    ALLEGED CONNECTIONS BETWEEN SETTIPANE, ERAMIAN, SOS, LYONS AND 192 HALE.

In the initial October 12, 2005 Affidavit, it is alleged that Settipane places bets with off-

shore gambling companies including, SOS and "000CROWNCASINO.COM".  (Exhibit 2, p.31-

32, ¶    50B & C).  The December 8, 2005 Affidavit alleges that it was "learned from intercepted

conversations that Todd Lyons is a conduit between SOS and Richard Settipane Jr. regarding the

collection of monies won or lost with respect to wagers placed by Richard Settipane, Jr."

(Exhibit 2, attached hereto, p.8, ¶10C).  There is no support for this allegation.  Later in the same

Affidavit Russolillo summarizes and includes a conversation between Settipane and William

Swartz in which Settipane tells Swartz to "duck" an individual named Ted or Todd's phone calls

because Settipane owes him money.  According to Russolillo, Lyons had numerous telephone

communications with SOS during the time period of the wiretap.  However, there were no calls

reported between Lyons and Eremian.  There is one call and one meeting between Lyons and

Settipane, but there is no evidence of money being exchanged or debts being settled or paid.

There is no evidence of 192 Hale except that Lyons lives there and returned there at some point

---

2Lyons has filed a separate motion seeking the suppression of the wiretap communications.  It is respectfully
submitted that if this Court determines that the wiretap evidence was unlawfully obtained, all evidence seized
pursuant to the subsequent searches must be suppressed as well.

following the meeting with Settipane.  There is no evidence of the nature of Lyons' relationship

with Settipane or SOS or Eremian.  Money is never discussed nor are sports wagers in any of

Lyons alleged conversations with Settipane or with SOS.

**D.      THE 2006 SEARCH WARRANTS**

On January 4, 2006, Russolillo signed another Affidavit in support of separate

applications for  search warrants for 192 Hale, Lyons' Audi and Lyons' person,  in addition

multiple other residences based in large part upon intercepted telephone communications and

surveillance conducted as a result of the interceptions.  (Exhibit 1).  The search warrant

applications were presented on January 4, 2006, to Justice Welch who signed the

application indicating that Russolillo had appeared before him.  (Exhibit 1).  However,

Justice Welch neglected to sign the search warrants.  The search warrant for 192 Hale directed

the officers to announce their presence but was not received by the Troopers executing the

search until 7:20 and was blank and unsigned.  (See Exhibit 8, attached hereto).

At 6:50 P.M. on January 4, 2006, federal and state law enforcement agents executed the

unsigned blank search warrants for 192 Hale, the Audi and Lyons's person.  Because no one was

home at the time of the officers arrival at 192 Hale, a window was broken to access the door lock

and the search was conducted without prior announcement to Lyons.  (See Exhibit 9, Report of

Trooper Cole, attached hereto).  When Lyons arrived home he was given unsigned copies of the

search warrant which did not contain any instructions to the officers as to how the search was to

be conducted.  (Exhibit 8).

On January 5, 2006, the Commonwealth moved *ex parte* to have Justice Welch "re-

execute" the warrants which was allowed and Justice Welch indicated his error in the margin of

4

the Order.  (See Exhibit 10, attached hereto).  Despite these efforts by the Commonwealth and the Justice, no mention is made in the State Police Report dated January 9, 2006, of the defective warrant or that it was later corrected.  (Exhibit 9). On the contrary, the State Trooper indicates that both Lyons' girlfriend and Lyons were served with copies of the search warrants.

The January 4, 2006 Affidavit as it related to Lyons was based entirely upon wiretap evidence of a small number of conversations between Lyons and others occurring over a short period in November and December of 2005, and limited surveillance based upon the same conversations.  (Exhibit 1).  There are very few references to Lyons in the Affidavit and even fewer references to 192 Hale.  The Affidavit incorporates by reference, but without stating the content, additional information contained in other affidavits submitted by Russolillo during the course of the investigation.  During the search of 192 Hale, law enforcement agents recovered a large quantity of cash and notebooks containing alleged gaming information.  (See Exhibit 9, attached hereto).

A subsequent search was conducted on February 5, 2009, of 192 Hale based upon the 2006 allegation, 2006 search results and information from confidential sources who alleged that Lyons was still engaged in activities for SOS.  (See Exhibit 11, attached hereto).

On May 6, 2010, Lyons was indicted on the instant charges and arrested at 192 Hale.  At the time of his arrest, his laptop was seized by the arresting officers based upon the speculation that he was engaged in sports betting activity at the time.  (See Exhibit 12, attached hereto).  The officers also believed that numerical notes found next to the laptop were evidence of gaming activity.  (See Exhibit 13, attached hereto).  The laptop was eventually searched in September 2010.  (Exhibit 12).

On August 5, 2010, the Defendant was named in a Superceding Indictment charging him generally with racketeering, money laundering, illegal gaming activities and filing false tax returns in 2005 and 2006 for tax years 2004 and 2005, respectively.

### III.  STANDING

Lyons is the deeded owner of 192 Hale and the registered owner of the subject Audi. The Government is not expected to challenge Lyons standing as Russolillo identified Lyons as residing at 192 Hale in all of his search warrant applications nor challenge Lyons ownership of the Audi or the laptop.  Therefore, Lyons has standing to challenge all of the searches conducted at 192 Hale.

### IV.  ARGUMENT

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  *Payton v. New York*, 445 U.S. 573, 589 (1980).  The Supreme Court has held that unreasonable searches or seizures conducted without any warrant at all are condemned by the first clause of the Fourth Amendment and that "[a]lmost a century ago, the Court stated in resounding terms that the principles reflected in the Amendment 'reached farther than the concrete form' of the specific cases that gave it birth, and 'apply to all invasions on the part of the government and its employees of the sanctity of a man's home and the privacies of life.'" *Id.* quoting  *Boyd v. United States*, 116 U. S. 616, 630 (1886).  The *Payton* Court further repeated '"[t]he right of the people to be secure in their . . . houses . . . shall not be violated."  That

language unequivocally establishes the proposition that, "[a]t the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion."' *Id.* at 590 quoting *Silverman v. United States*, 365 U. S. 505, 511 (1961).   The Court applied these terms equally to seizures of property and to seizures of persons, mandating that "the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Id.*

A.   **THE EXECUTION OF THE UNSIGNED WARRANT VIOLATED LYONS' FOURTH AMENDMENT RIGHTS.**

The First Circuit has held that under Massachusetts law, the police need not submit an affidavit in support of an application for a warrant and that a mere "ministerial defect," such as the lack of an official signature, **may** not render an arrest warrant invalid.  *Burke v. Town of Walpole*, 405 F.3d 66, 78 (2005); *Commonwealth v. Baldassini*, 357 Mass. 670 (1970)*; Commonwealth v. Pellegrini,* 405 Mass. 86, 89 (1989) (excusing ministerial defects in search warrant where "there is no dispute that the judge intended to issue the warrant")(emphasis supplied).  The Fourth Amendment requires at a minimum, however, that a warrant be "supported by Oath or affirmation." *Id.*  Federal courts have required that where the federal rules for search warrants are violated, exclusion is not the remedy unless (1) prejudice can be demonstrated that would not have occurred if the rule had been followed, or (2) there is evidence of intentional and deliberate disregard for Rule 41.  *United States v. Burke*, 517 F.2d 377, 386-387 (2d Cir. 1975).  Here, the violations are so numerous that intentional and deliberate disregard must be inferred.  Also, the failure to serve Lyons with the "re-executed" warrant prejudiced him by delaying his ability to seek relief through the courts for the execution of the

7

unsigned warrant.

1. **Justice Welch's Failure to Sign the Warrant Was Not a Ministerial Defect and Rendered the Search Unlawful Mandating the Suppression of the Fruits of the Search.**

It is incontrovertible that the searches of 192 Hale, the Audi and Lyons were performed pursuant to an unsigned warrant.  (Exhibits 1 & 10).  The warrant was signed the next day after the Commonwealth moved to have the warrant "re-executed".  (Exhibits 1 & 10).  It is difficult to even imagine this alleged oversight occurring.  The top of the warrant application states in bold letters **"CAUTION:  Detach Instructions and Affidavit before writing on this form**". (Exhibit 1).  The application and search warrant are part of the same form "TC-SW-1 (7/89)". The applications in this case do not state that the applicant has provided an affidavit because the entire section is blank in paragraph 1.  Therefore, it is unclear what Justice Welch attested to by signing the bottom of the application on January 4, 2006.  More importantly, there were 23 search warrants presented in this manner on January 4, 2006, presumably with Russolillo, the Justice and possibly a clerk being present.  The fact that this many eyes could forget something as significant as the signature on the search warrant 23 consecutive times is baffling.  A hearing should be held to determine the nature and circumstance related to this alleged oversight.

In support of the "re-executed" warrant, the Commonwealth and Justice Welch relied upon *Pelligrini* upholding the validity of a search conducted pursuant to an unsigned warrant, *albeit* with a strong dissent from former Chief Justice Liacos.  *Commonwealth v. Pelligrini,* 405 Mass. at 89.  In *Pelligrini,* it was clear that the magistrate had reviewed the warrant application under oath and had intended to issue the warrant, but for his failure to sign it.  *Id.*

However, in the instant case, it is not known from any of the reports, affidavits or

motions exactly what Russolillo presented to Justice Welch initially, when the Commonwealth realized and who realized that Justice Welch had not signed the warrants and, most importantly, how he was approached to remedy the error.  For example, it would be far more egregious for the Commonwealth to have executed the search warrant knowing that it was unsigned.  This would be a critical distinction from *Pelligrini.*  It would also have been far more egregious for the Commonwealth to have represented to Justice Welch that the application was presented to him on January 4, 2005, when in fact it may not have been.  The fact that a well respected and meticulous Justice could neglect to sign three warrants out of twenty-three all dealing with the same individual defies logic.

These issues would also distinguish the instant case from *Pelligrini.*  Most importantly, *Pelligrini* does not stand for the proposition that an unsigned warrant is valid in every case.  The phrase "may not render" the search warrant invalid connotes that this is the exception rather than the rule and that the facts of each case must be reviewed.  *Id.*  Other factors regarding the search of Lyons' property may also mitigate in favor of suppression.

This also appears to be an issue of first impression in the First Circuit.  Federal Courts that have considered the issue of a judge's failure to sign a search warrant have concluded the error to be *deminimus* and the fruits of the search not subject to suppression.  *United States v. Turner,* 558 F.2d 46, 52 (2nd Cir. 1977)(telephonic warrant application process upheld where Judge authorized his agent to sign the warrant).  Other Court that have considered the issue have split on whether to suppress the fruits of a search conducted by law enforcement with an unsigned warrant.  *Pelligrini,* supra. at 88-89.

More recently, Justice Gants now an Appeals Court Justice, held that the failure to sign a

warrant required suppression.  *Commonwealth v. Muller*, 18 Mass. L.Rep. 483 (Mass. Super. 2004).  Additionally, the failure to give an oath combined with the unsigned warrant was distinguished from *Pelligrini*.  *Commonwealth v. Alves*, 14 Mass.L.Rep. 248 (Mass. Super. 2001).

At a minimum, a hearing is necessary to determine the facts surrounding the initial application process, when the neglect occurred, when the neglect was discovered and how the issue of the neglect was presented to Justice Welch.  Therefore, a hearing is requested to determine this issue.

>    **2.**    **The Police Commenced the Search Prior to Receipt of Any Warrant and Without Receiving a Signed Warrant at Any Time**.

As evidenced by the copy of the unsigned and unexecuted warrant given to Lyons at the time of the search, it was received by law enforcement at 7:20 P.M.  (Exhibit 8).  This is after the search had already been commenced by the Trooper assigned to 192 Hale at 6:50 P.M..  (Exhibit 9).  Therefore, at the time the search was commenced and the window at 192 Hale was broken the State Police were not in possession of the warrant and could not properly execute it.

>    **3.**    **The Forced Entry into 192 Hale was not Justified by the Unsigned Warrant and the Fruits Derived Therefrom Must be Suppressed.**

As discussed, when the officers found that no one was home at 192 Hale, instead of securing the premises and correcting the defect in the warrant, they chose to break a window to gain access to the residence without presentment or announcement of a valid warrant to Lyons.

When Lyons arrived home he was handed a copy of an unsigned warrant which did not contain any instructions for how the warrant was to be executed.

**4.      Lyons was never served with a signed or amended warrant.**

At no time following the "re-execution" of the warrant did the Commonwealth serve

Lyons with a copy of the "re-executed" warrant.  While each of the errors committed during the

execution of the warrant in paragraphs 2-4 above might individually be considered "ministerial"

under *Pelligrini*, the combined effect was to deprive Lyons of his constitutional rights.

**B.      THE AFFIDAVIT IN SUPPORT OF THE SEARCH WARRANT FOR 192 HALE
         FAILS TO ESTABLISH  PROBABLE CAUSE AND A NEXUS BETWEEN ANY
         CRIMINAL CONDUCT AND 192 HALE.**

A warrant application must establish probable cause to believe that (1) a crime has been

committed (the "commission element"), and (2) specifically described evidence will be found at

the place to be searched (the "nexus element").  *United States v. Feliz*, 182 F.3d 82, 86 (1st Cir.

1999); *United States v. Zayas-Diaz*, 95 F.3d 1005, 111 (1st Cir. 1996).  The probable cause

inquiry gauges the likelihood that the evidence of criminal conduct may presently be found at a

specific location and a warrant must be supported by "facts so closely related to the time of the

issue of the warrant as to justify a finding of probable cause *at that time*"  *United States v.*

*Hython*, 443 F.3d 480, 485 (6th Cir. 2006), *quoting Sgro v. United States*, 287 U.S. 206, 210

(1932).

In the case at bar, the unverified information should be disregarded in the

determination of probable cause. *Commonwealth v. Saleh*, 396 Mass. 406, 410 n.6 (1985)

(court disregards portion of affidavit concerning second informant whose reliability not shown).

Stripped of this information, it is submitted that the affidavit fails to establish probable cause a

considerable portion of the balance of the affidavit is dedicated to background

information that, upon close examination, is truly irrelevant to the probable cause

determination.

1.     **The January 4, 2006 Affidavit of Russolillo**

The 116 page Affidavit of Russolillo attempts to summarize the evidence accumulated

against numerous individuals through wiretaps and surveillance over the period of time from

October 12, 2005 to January 4, 2006.  It is conceded for purposes of the instant motion that the

Affidavit clearly establishes probable cause to believe that Settipane and Demarkis are engaged

in an illegal sports betting operation and that Settipane sometimes places bets himself or refers

others to off-shore sports betting operations.  It is also clear that Eremian has a long standing

history of sports gambling and at the time of the wiretaps was located in Antigua.  Eremian also

had a lengthy conversation with Settipane about sports betting and a customer in which the first

name "Todd" is used, but no gambling debt owed by Settipane was discussed.  Lyons also meets

with Settipane on one occasion after Settipane has a conversation with Swartz about owing

someone named "Ted" or "Todd" money and stalling payment for a period of time.  It is not

clear what this debt is for.  No money is seen changing hands during this meeting and it is not

certain what the purpose of the meeting was.  Very little is established about Lyons connection

to Eremian, SOS or Settipane.

The portion of the Affidavit which pertains to Todd Lyons is contained in paragraphs

166-182 on pages 67-74.  Significantly, the Affidavit also attempts to summarize telephone

conversations which are set forth in prior Affidavits of Russolillo in support of wiretap

applications.  This practice leads Russolillo to inaccuracies, broad generalizations and

unsupported conclusions which become apparent when compared to the actual conversation.

The relevant portions of the January 4, 2006 Affidavit are summarized as follows:

**Paragraph 166** is a conclusory paragraph that purports to incorporate prior affidavits without any factual support. It is said that Lyons uses 192 Hale to further SOS's activities and receives a commission for meeting with and picking up money from agents and bettors. It is further stated that Lyons uses his computer to contact SOS. Aside from correctly stating Lyons address as 192 Hale, nothing else in the paragraph is substantially supported by facts gathered during the investigation. In fact, the allegation that Lyons receives a commission or has a computer are not supported by any facts set forth in the January 4, 2006 Affidavit or any other affidavit. While it is clear that Lyons has had telephone conversations with individuals (Settipane and Means) who have contacts with Eremian, it is far from clear what the nature of those conversations or meeting are. No money is ever observed to be exchanged and is not discussed. More importantly, Lyons relationship to Eremian is not established with any degree of certainty. There are no conversations between Lyons and Eremian. While other individuals including Eremian talk about "Todd", no last name is ever used and it is not clear what role "Todd" plays, if any. There is certainly never a description of "Todd's" role as described in this paragraph.

**Paragraph 167** does not establish anything other than the fact that Lyons lives at 192 Hale. Paragraph 168 indicates that there is no subscriber information about the phone used by Lyons. It is never clearly stated how Russolillo was able to identify Lyons as the person using (781) 526-0591. However, it is implicit that Russolillo was able to connect Lyons to this phone by surveilling the meeting that Settipane had arranged on December 2, 2005, and running the registration information on the Audi driven by Lyons to the meeting. The first request to place a

wiretap on Lyons' phone occurred on December 8, 2005, six days after the meeting.  As discussed, Lyons name was not mentioned as being within the scope of the investigation until December 8, 2005.

**Paragraph 169** is a conclusory paragraph that purports to incorporate prior affidavits and without any factual support.  It is said that Lyons uses 192 Hale to further SOS's activities by acting as a runner or agent.  Aside from correctly stating Lyons address as 192 Hale, nothing else in the paragraph is substantially supported by facts gathered during the investigation. There is no evidence that Lyons uses the residence to store records or proceeds.  No one saw him bring cash in or out.  Moreover the question of why he would need records if he is a runner is never answered.   Lastly, even if money were stored there, it would leave the house as quickly as it came in to satisfy other bettors or as a transfer to SOS.  There is no evidence that proceeds would be found there on any specific date.  Even assuming as Russolillo does that the December 2, 2005 meeting with Settipane was for Settipane to deliver money to Lyons, and assuming Lyons took the money home, there is no reason to believe the same money would be at 192 Hale on January 4, 2006, given the alleged role attributed to Lyons.

**Paragraph 170** contains no specific allegation of wrongdoing on the part of Lyons.  The paragraph merely reports that a telephone alleged to belong to Lyons was part of prior wiretaps.

**Paragraph 171** contains no specific information regarding alleged wrongdoing on the part of Lyons.  Lyons' calls are lumped in with Settipane and there is no breakdown for the number of calls, no evidence of content of calls and no evidence which shows that a majority of Lyons' calls related to gaming.  Lyons could have been placing bets with Settipane or hiring a limousine from Settipane's limousine company.  The paragraph asserts without factual support

that Lyons "was responsible for meeting bettors and/or agents" to either collect or pay money that resulted from wagers placed with SOS.  There is evidence in the following paragraphs that Lyons met with some bettors, but there is no evidence as to what the meeting was for.  No cash was observed to exchange hands and the meetings were not recorded.  Russolillo again refers to other affidavits incorporated by reference.

**Paragraph 172** makes the general observation that Lyons would make arrangements to meet with bettors or agents and would leave 192 Hale, attend a meeting and go "directly to his residence" when he had completed his meetings.  This statement is not supported by the evidence submitted to the Justice.  There is a comment about Anthony Messana which appears out of place in this paragraph and has nothing to do with Lyons.  The conclusion that Lyons stores money and records at his home is pure speculation.

**Paragraphs 173 and 174** contain an inaccurate summary of the calls between Settipane, Swartz and "a representative of SOS" on November 17 and 19, 2005.  The calls between Settipane and Swartz are transcribed more specifically in the December 8, 2005 Affidavit. However, there is no reference to a call with SOS on either of those dates.  Swartz indicates to Settipane on November 17, 2005, that he received a call from someone he says is "Ted". Settipane speculates that it could be "Todd" who he tells Swartz initially to avoid because he owes "Todd" money and later to call and make an excuse for not meeting him.  There is no mention of Lyons' last name or SOS.  In paragraph 174 describing a conversation with Eremian on November 23, 2005, there is no mention of a debt owed by Settipane to SOS.  Settipane is attempting to refer SOS a customer.  There are a few references to "Todd", but no mention of Lyons' last name or his role.  Eremian is clearly still in the gaming business but does not refer to

15

Todd's role or last name or any debt owed by Settipane.

      **Paragraph 175** describes a December 2, 2005 call between Settipane and SOS in which he says "Have Todd call me."  An hour later Settipane receives a call to meet Lyons and they meet.  This meeting is observed by Trooper Kevin Murphy, but he did not see Lyons go home, Det. Lt. Stephen Johnson observed him go home.  There is no evidence of any money changing hands.  In fact, it makes more sense that Lyons and Settipane met to discuss the new customer which Settipane was referring to Eremian.  It is pure speculation that Lyons met with Settipane to receive money owed by Settipane to SOS and drove with the money to his home.  Even assuming money was exchanged, the break in surveillance negates the conclusion that Lyons went directly home.  The conclusion that Lyons works for Eremian and that meeting was because of Eremian is also speculation.  There is no evidence that Eremian even knew of the meeting.

      **Paragraph 176** also contains speculation that Richard Sullivan works for SOS.  How Sullivan's last name is known and how he is connected to SOS by the State Police is not known.  The message is transcribed in the December 21, 2005 Affidavit and all it says is that Richard LNU who wants Lyons to call him after the "one o'clocks" or to come "online anytime"  Without the identifying information the allegation contained in the paragraph is meaningless.  There is no mention of SOS or the reason for the call.  Moreover the fact that Sullivan would contact Lyons is not evidence of the relationship described by Russolillo.  It could simply be evidence that Lyons is a customer of SOS.

      **Paragraph 177** summarizes a December 15, 2005 conversation between Lyons and Chris Means in which a meeting is discussed, but not confirmed.  This conversation is

transcribed in the December 21, 2005 Affidavit.  Lyons says in reference to someone, (perhaps "Billy" who is mentioned earlier in the conversation), "I don't know if he was gonna maybe send checks out."  From this obscure reference, the Affidavit concludes that "Billy" is "William Means" a relative of Chris and that Billy may send checks to Bob Eremian.  From this speculation it is further speculated that this is proof that Lyons is a "runner and settles up" with various bettors and agents associated with SOS despite the fact that checks may be sent thereby negating Lyons alleged purpose.   Once again, Russolillo incorporates by reference his prior Affidavits which add nothing but a transcript to this conversation.

**Paragraph 178** summarizes a December 16, 2005 conversation and meeting between Lyons and Scott Clayman.  This conversation is also transcribed in the December 21, 2005 Affidavit.  Lyons states that he is on his way from another meeting and is not coming from home.  Lyons mentions a figure of "sixteen, five one two" that Clayman needs to confirm.  They then meet in a Staples parking lot and are surveilled by Trooper Foley.  There is no mention of cash being exchanged or whether this is a gambling debt or who is paying whom.  There is no mention of Bob Eremian or SOS.  More importantly, despite the surveillance there is no mention that Lyons returned home after the meeting.  From these facts Russolillo concludes that Lyons is employed by Eremian "for the sole purpose to meet with individuals in order to collect or pay monies won or lost from wagers placed with SOS."

**Paragraph 179** contains a second conversation between Lyons and Chris Means on December 19, 2005 and a meeting.  Chris indicates that he is with "Billy" and they agree to meet at a Dairy Queen on Route 18 in Weymouth and are surveilled by Det. Lt. Stephen Johnson.  There is no mention of money being exchanged or the purpose of the meeting.  There is no

17

indication that Lyons came from his home to attend the meeting or returned to his home following the meeting.  There is no additional surveillance listed and Weymouth is a least an hour's drive from Weymouth.

**Paragraph 180** attempts to incorporate by reference all prior affidavits in concluding that Lyons is involved in the offshore gaming business and uses his cell phone in furtherance thereof.  **Paragraph 181 and 182** state the belief that there is probable cause to believe that Lyons uses 192 Hale in furtherance of criminal activities and that evidence of Eremian's gaming enterprise will be found in Lyons Audi, on his person and in his home.  This conclusion is based upon the prior affidavits and search warrants are requested for all three.

The purportedly incriminating evidence falls into three (3) categories which can be summarized as (1) conclusory and speculative statements of Russolillo which are not evidence (paragraphs 166, 169, 171, 172, 180, 181), (2) summaries of recorded telephone calls (paragraphs 173-179), and (3) surveillance of Lyons based upon the telephone calls (paragraphs 172, 175, 178, 179)3.  At best, the telephone calls and surveillance establish that Lyons had contact with alleged sports gamblers.  One conversation between Settipane and Eremian suggests that an individual named Todd is known to Eremian.4  There is no other connection.  There is only one conversation involving Lyons and Clayman that in which a number is discussed that could be inferred to be a debt owed.  However, there is no mention of what the debt is for and who is owed.  More importantly there is never any reference to any payments or money being

---

3Paragraphs 167, 168 and 170 provide identifying or background information which does not add to the probable cause or nexus determination other than to identify 192 Hale as Lyons' residence.

4Prior affidavits do contain specific call numbers between Lyons and SOS, but again the content is never revealed and it cannot be concluded that Lyons is a runner based upon these calls.  It is more likely that he has a gambling arrangement with SOS based upon the quantity of calls.

seen in Lyons possession or at 192 Hale.  There was no transaction observed at any time or

evidence that money was received or paid to anyone.  These facts, even if true, do not justify the

inference that quantities of cash or gambling records would be found at 192 Hale.  In fact, there

is only one factual reference to surveillance showing Lyons going to 192 Hale and it was a

broken surveillance chain in which one officer followed Lyons to the meeting with Settipane and

another officer later saw Lyons arrive at 192 Hale.  This does not support the conclusion that

Lyons received money and went directly home.

In *Feliz*, the First Circuit reversed the District Court's order suppressing evidence seized

from a suspected drug dealer's apartment based upon a determination that a reasonable inference

from the affidavit was that the defendant was a "long-time, successful, drug trafficker."  *Id.*   In

the instant case, there is no such inference to be drawn where there is scant evidence that Lyons

was engaged in criminal activity let alone successful.  More importantly, there is no evidence of

any criminal activity involving 192 Hale.

As discussed, the very small number of phone calls (7) set forth in the affidavit are

dissimilar to each other and fail to establish any pattern of activity on the part of Lyons.  These

calls are not cured by closer inspection of the wiretap affidavits.  Unlike the defendant in *Feliz*

this is not activity consistent with a long time successful criminal who might have acquired

sufficient illegal proceeds for the Government to assert that it is stored at his residence.  As a

result, the search of 192 Hale Street violated the Defendant's Fourth Amendment rights.

The mere fact that Lyons had conversations with individuals suspected of gambling does

not create a probability that the Lyons had contraband in 192 Hale.  *United States v. Helton,* 314

F.3d 812, 821 (6th Cir. 2003)(fact that person averages three calls per month to a drug dealer

does not create a probability that the person has contraband in their house).

2.      **Incorporation by Reference of Wiretap Affidavits is not Constitutionally Permissible and did not Salvage the Insufficient Application**.

As discussed, at numerous instances in the Affidavit as it related to Lyons, Russolillo incorporates by reference his prior affidavits in support of the wiretaps.  Because only the December 8, 2005 and December 21, 2005 Affidavits contain information about Lyons, these are presumably the only affidavits which could buttress the January 4, 2006 Affidavit.  However, this process violates Lyons' constitutional rights by not affording Justice Welch the opportunity to review the material in front of him at the time the warrant is presented and verifying that summary statements presented in the affidavit in support of the search warrant are accurate.

It is settled that the "peculiar experience and knowledge" of the issuing Justice would not support the issuance of the warrant.  *Commonwealth v. Taglieri,* 378 Mass. 196, 198-199 (1979) *cert. denied* 444 U.S. 937 (1979).  Here, the fact that the same Justice had reviewed the wiretap evidence alone would not support the issuance of a search warrant especially since the Justice had already concluded by virtue of the wiretap authorizations that search warrants were not available to law enforcement as a normal investigative means.  (See Exhibit 2-7, attached hereto).  Similarly, Russolillo represented that search warrants were not available as a normal investigative means as recently as in his December 21, 2005 Affidavit.  (Exhibit 7).  This is different from the facts presented in *Commonwealth v. Jordan,* 397 Mass. 494, 496-497 (1986), where the Judge had reviewed a prior search warrant application for the same address which did properly state the place.  As a result, the court concluded that the second warrant which omitted the place incorporated the first warrant by reference thereby salvaging the warrant.  *Id.*

Here, the wiretap applications in the instant case required a different burden of proof than

20

the search warrant in *Jordan*.  In order to obtain the wiretaps Russolillo needed to show that the

State Police (1) made a reasonable good faith effort employing normal investigative procedures

before applying for the wiretap and that (2) despite a similar good faith effort alternative

techniques would fail to expose the crime.  *United States v. Santana*, 342 F.3d 60, 65 (1st Cir.

2003); *United States v. Ashley*, 876 F.2d 1069, 1073 (1st Cir. 1989).5

　　　　More importantly, *Jordan's* reliance on *Commonwealth v. Mitchell*, 350 Mass. 459, 463-

464 (1966), is not instructive here where it is not clear that the missing information (the wiretap

affidavits) were available to Justice Welch at the time he issued the search warrants to compare

to the summaries being provided by Russolillo.  As a practical matter, *Jordan* and *Mitchell* each

stand for the proposition that the incorporated material must be available to the issuing authority.

There is no such evidence here.  However, it is not presently known where Justice Welch was in

relation to the wiretap affidavits on January 4, 2006.  January 4, 2006, was a Wednesday and a

normal business day for the Essex Superior Court.  Essex does have three separate Superior

Court buildings and Justice Welch could have been in any one of the three.  It is also possible

that since the search did not begin at 192 Hale until 6:50 P.M., that the warrant was presented

after normal court hours and at the Justice's home or another location.  The unsigned warrants

presented to Lyons on January 4, 2006 have a fax encryption of  "01/04/06 19:20 FAA".  (See

Exhibit 8, attached hereto).  Since the report indicates that Lyons did not arrive home until 7:46

P.M., it is likely that the officers at 192 Hale did not have the warrant until 7:20 P.M., after the

---

5Although M.G.L. c. 272 § 99 requires the issuing Judge to also find probable cause to believe that individuals were committing, about to commit or had committed certain criminal violations, the fact that Justice Welch issued the December 12, 2005 wiretap on Lyons' telephone does not support the conclusion that there was probable cause to support a search of 192 Hale.  In fact the Order is to the contrary *i.e.* that a search warrant is not likely to produce evidence.

search began.

To the extent that the summaries of recorded conversations are misleading in the January 4, 2006 Affidavit, the Court is respectfully directed to the *Franks* argument set forth herein. Accordingly, Russolillo's January 4, 2006 Affidavit (1) impermissably incorporates by reference other affidavits authored by him which may not be considered for purposes of a subsequent search warrant, (2) which do not accurately summarize relevant conversations and (3) where it is presently unknown whether the wiretap affidavits were available to the Justice at the time he reviewed the search warrant application.  At a minimum a hearing is necessary to determine where, when and how the search warrants were reveiwed and where the wiretap affidavit were at the time.

**C.     LYONS' MOTION FOR A HEARING PURSUANT TO *FRANKS V. DELAWARE* BASED UPON MATERIALLY FALSE AND MISLEADING STATEMENTS CONTAINED IN THE AFFIDAVIT IN SUPPORT OF THE SEARCH WARRANT.**

It is respectfully submitted that because the Magistrate Judge could not have issued the search warrant had he been apprised of the real facts and not presented with materially false and misleading statements, this Court should convene an evidentiary hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), and thereafter suppress all evidence seized by the government from Lyon's residence.  This Court has held that in order for a defendant to be entitled to an evidentiary hearing it must be shown that a statement was "knowingly and intentionally false or made with reckless disregard for the truth" and that the statement was material to a finding of probable cause.  *United States v. Habershaw*, 2002 U.S. Dist. LEXIS 9877, p. 9 (D.Mass. 2002, Saris, J.).  For the foregoing reasons the Affidavit of Russolillo contained numerous false statements that were intended to be material to the finding of probable cause.

22

Russolillo's affidavit was drafted for the purpose of obtaining search warrants for numerous residences including the Defendant's.  The affidavit itself contains a paucity of evidence relevant to the Defendant.  All of the evidence was derived from wiretaps and are subject to Russolillo's intentionally misleading interpretations of the facts.  This evidence can be summarized as follows:

1.    Paragraph 166 states without support that Lyons uses 192 Hale to further SOS's activities and receives a commission for meeting with and picking up money from agents and bettors.  It is further stated that Lyons uses his computer to contact SOS.  There is no evidence supporting these specific conclusions in the affidavits.

2.    Paragraph 169 alleges that Lyons uses 192 Hale to further SOS's activities by acting as a runner or agent but this is not substantially supported by facts gathered during the investigation. There is no evidence that Lyons uses the residence to store records or proceeds.

3.    Paragraph 171 asserts without factual support that Lyons "was responsible for meeting bettors and/or agents" to either collect or pay money that resulted from wagers placed with SOS.   There is no evidence that any meeting involved the payment of a debt except the Clayman conversation and there is no evidence what the debt was for or who was paying who.  There is no evidence of any money being exchanged at any time.

4.    Paragraph 172 makes the general observation that Lyons would make arrangements to meet with bettors or agents and would leave 192 Hale, attend a meeting and go "directly to his residence" when he had completed his meetings.

This statement is false and not supported by the evidence submitted to the Justice at any time. There is no evidence with respect to the Clayman or Means meeting that Lyons was home before or after the meeting. The Settipane meeting resulted in Lyons ultimately going home, but there is no evidence that he went directly home. The conclusion that Lyons stores money and records at his home is pure speculation, but appears to be based on this same false statement.

5.     Paragraphs 173 and 174 contain an inaccurate summary of the calls between Settipane, Swartz and **"a representative of SOS"** on November 17 and 19, 2005. There is no evidence of a call with SOS on either of those dates. This is false. Swartz indicates to Settipane on November 17, 2005, that he received a call from someone he says is "Ted". Settipane speculates that it could be "Todd" who he tells Swartz initially to avoid because he owes "Todd" money and later to call and make an excuse for not meeting him. There is no mention of Lyons' last name or SOS. In paragraph 174 describing a conversation with Eremian on November 23, 2005, there is no mention of a debt owed by Settipane to SOS. This is false, Settipane is attempting to refer SOS a customer.

6.     Paragraph 177 concludes that "Billy" is "William Means" a relative of Chris and that Billy may send checks to Bob Eremian. This statement is such pure speculation that it is reckless. Without a last name and the identity of the payee it is impossible to conclude who may be sending or receiving a check.

7.     Paragraph 178 contains a description of the meeting with Clayman, but recklessly concludes that it was to collect money for Eremian or SOS. There is no mention

of cash being exchanged or whether this is a gambling debt or who is paying

whom.  There is no mention of Bob Eremian or SOS.  More importantly, despite

the surveillance there is no mention that Lyons returned home after the meeting.

From this speculation Russolillo concludes that Lyons is employed by Eremian

"for the sole purpose to meet with individuals in order to collect or pay monies

won or lost from wagers placed with SOS."

In *Franks v. Delaware,* the Supreme Court recognized a defendant's right to challenge

the sufficiency of a previously issued and executed warrant by attacking statements made in an

affidavit in support of the warrant.  438 U.S. 154, *United States v. Adams*, 305 F.2d 30, 36 n.1

(1st Cir. 2002).  It did so "[b]ecause it is the magistrate who must determine independently

whether there is probable cause, [and] it would be an unthinkable imposition upon his authority

if a warrant affidavit, revealed after the fact to contain a deliberately or recklessly false

statement, were to stand beyond impeachment."  *Id.* at 165.  To be entitled to a *Franks* hearing, a

defendant must make a substantial preliminary showing that (1) specified portions of the

affiant's averments are deliberately and recklessly false and (2) that a finding of probable cause

would not be supported by the remaining content of the affidavit when the allegedly false

material is aside.  *United States v. Reiner*, 500 F.3d 10, 14 (1st Cir. 2007).  If the Court's

assessment is that probable cause would not exist if the false statements are excluded from the

determination, then the Court must hold a full evidentiary hearing to determine whether the

affidavit was properly submitted.  *United States v. Ranney*, 298 F.3d 74, 78 (1st Cir. 2002).

*Franks* also applies to omissions as well as to "technically accurate statements that have

been rendered misleading by material omissions."  *United States v. Grant*, 218 F.3d 72, 77 (1st

Cir. 2000).  Where omissions are at issue, the defendant is entitled to a *Franks* hearing if he makes a preliminary showing that the affiant with an intention to mislead excluded critical information from the affidavit and that the omission is critical to a finding of probable cause. *United States v. Castillo*, 287 F.3d 21, 25 (1st Cir. 2002).  In the case of an omission, suppression may be ordered where the affidavit, "clarified by disclosure of previously withheld material, no longer demonstrates probable cause."  *United States v. Stewart*, 337 F.3d 103, 105 (1st Cir. 2003).

In the instant case, Lyons has set forth sufficient evidence of false and misleading statements to justify a *Franks* hearing.  It is respectfully submitted that this hearing should be expanded to include subject matters related to Justice Welch's failure to sign the warrant.

**D.    THE AFFIDAVIT SUBMITTED IN SUPPORT OF THE WARRANT APPLICATION WAS SO LACKING IN PROBABLE CAUSE THAT THE GOOD FAITH EXCEPTION SHOULD NOT SALVAGE THE SEARCH.**

The "good faith" exception to the exclusionary rule was announced in the Supreme Court's decision in *United States v. Leon,* 468 U.S. 897, 921 (1984).  This exception provides that the "extreme sanction" of the exclusion of evidence from trial does not apply when the evidence is seized pursuant to a search warrant obtained in an "objectively reasonable manner" from a neutral magistrate, even where the warrant or supporting affidavits were defective.  *Id.* The Supreme Court itself recognized, however, that the reviewing court's deference to the magistrate's finding of probable cause "is not boundless."  In fact, no deference should be accorded where the affidavit "does not provide the magistrate with a *substantial basis* for determining probable cause."  *Id.* at 915, quoting *Illinois v. Gates,* 462 U.S. 213, 239 (1983) (emphasis added).  Thus, a reviewing court may find that "the warrant was invalid because the magistrate's probable cause determination reflected an improper analysis of the totality of the

circumstances," even where a more than "bare-bones" affidavit was presented.  *Leon,* 468 U.S. at 915.  Even in the wake of the good faith exception, suppression remains the appropriate remedy where the warrant was "based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'"  *Id.* at 923, quoting *Brown v. Illinois,* 422 U.S. 590, 610-11 (1925).

The First Circuit has repeatedly acknowledged the existence of circumstances where "the good faith exception would not salvage a search."  *United States v. Ricciardelli,* 998 F.2d at 16, citing *United States v. Fucillo,* 808 F.2d 173, 177-78 (1ˢᵗ Cir.), *cert. denied,* 482 U.S. 905 (1987). *See also Zayas-Diaz,* 95 F.3d at 115.  In *Fucillo,* suppression was ordered when the warrant did not sufficiently describe the things to be seized.  808 F.2d at 177-78.  In *Ricciardelli,* the Court reversed the district court's denial of a motion to suppress upon a finding that the *Leon* doctrine did not apply "because a reasonably prudent officer should have known that the procured warrant was substantially defective on its face, and because the defect was largely, if not entirely, the result of the office's incomplete account to the magistrate."  *Ricciardelli,* 998 F.2d at 17.  Other Circuits have found the absence of probable cause to require suppression despite *Leon, e.g., Webber,* 923 F.2d at 1346, nor can warrants so obviously over general as the one in the case at bar be salvaged by the good faith exception.

It appears from the report that the officers commenced the search prior to receiving the actual warrant.  This in and of itself does not establish good faith.  More importantly,  it is apparent from the face of the warrant that it is unsigned and contains no instructions.  This would have been clear to the officer at 192 Hale at the time of the search.  Additionally, a reasonably prudent officer should have seen that the affidavit failed to establish a nexus between

the items sought and the place to be searched.  There was literally no evidence in the Affidavit in

support of the warrant that indicated that money or records would be found at 192 Hale.  This is

not the "close call" situation found by Judge Ponsor in *United States v. Gonzalez,* 164 F.Supp.2d

119, 126 (D. Mass. 2001), where the officer could reasonably rely on the magistrate's

determination.

      As the First Circuit held in *Ricciardelli*:

> In these circumstances, the magistrate's imprimatur on the warrant cannot save
> the day.....Suppression of the evidence seized by means of the invalid warrant is
> appropriate "to compel respect for the constitutional guaranty in the only effective
> available way - by removing the incentive to disregard it."

998 F.2d at 17, quoting *Mapp v. Ohio,* 367 U.S. 643, 656 (1961).

      The privacy interests in the information contained in an individual's home and vehicle

are substantial.  Also, there exists significant potential for overly broad intrusions by the

government by way of wholesale rummaging through all of the private information contained

therein on the strength of warrants which justify, at most, the seizure of very limited information.

It is thus respectfully submitted that the courts need to be particularly vigilant in monitoring

compliance with the dictates of the Fourth Amendment when dealing with warrants directed at

specific items of personal property, and the courts should be loathe to allow government agents

to escape the deterrent effect of suppression when those constitutional requirements are violated.

The particular Fourth Amendment issues implicated here need to be decided "to guide future

action by law enforcement officers and magistrates." *Zayas-Diaz,* 95 F.3d at 115 n. 8, quoting

*Leon,* 468 U.S. at 925, 104 S.Ct. at 3421-22.  Thus, The Fourth Amendment questions in the

instant case should not be bypassed in favor addressing the *Leon* good faith exception first.  For

it is the magnitude of the constitutional defects in the affidavit that should, it is submitted,

ultimately persuade this Court that it is not "subject to amelioration under the *Leon* doctrine."

*Ricciardelli,* 998 F. 2d at 17.

**F.     ALL EVIDENCE SEIZED AS A RESULT OF 2009 SEARCH WARRANT AND THE LAPTOP WAS OBTAINED THROUGH THE USE OF EVIDENCE OBTAINED FROM THE UNLAWFUL 2006 SEARCH OF 192 HALE AND MUST ALSO BE SUPPRESSED AS FRUITS OF THE POISONOUS TREE**

Any evidence seized by law enforcement in this case derives from the unlawful search of 192 Hale in January, 2006.   The Supreme Court has held that law enforcement  cannot benefit from exploiting an illegal search and that all such evidence derived from the illegal search must be suppressed as fruits of the poisonous tree.  *Wong Sun v. United States,* 371 U.S. at 487-488. Accordingly, all illegally obtained evidence in this case must be suppressed.

Where the evidence is seized pursuant to a warrant which was obtained through an affidavit containing false information, the proper remedy is to excise the tainted information from the warrant and assess whether sufficient evidence exists to establish probable cause to justify the search.  *United States v. Reiner*, 500 F.3d at 14.  Here, both the 2009 Affidavit in support of the search of 192 Hale, (Exhibit 11) and the 2010 Affidavit in support of the search of the laptop, (Exhibit 12), contain information which must be stricken because it was unlawfully seized in 2006.  *Id*.  When the Affidavits are properly redacted, there is insufficient probable cause to justify the issuance of the warrants.  Accordingly, the fruit of the 2009 search of 192 Hale and the 2010 search of the laptop must be suppressed.

**H.    THE SEIZURE OF LYONS' LAPTOP AND SUBSEQUENT SEARCH PURSUANT TO A WARRANT WAS UNCONSTITUTIONAL BECAUSE THERE WAS NO PROBABLE CAUSE TO BELIEVE THAT LYONS WAS ENGAGED IN ILLEGAL ACTIVITY AT THE TIME OF HIS ARREST.**

At the time of his arrest on the initial Indictment on May 6, 2010, Lyons was at 192 Hale watching the Red Sox game on television and looking at other baseball scores on CBS Sports.com on his laptop.  (See Affidavit of Todd Lyons, filed herewith).  The arresting officers seized his computer because they believed that he was actively involved in illegal sports gambling activity.  (Exhibit 12).  This conclusion was based upon the CBS Sports.com website and numerical notations found next to his computer which appeared to be related to gambling.  (Exhibit 13).

However, there was no probable cause to believe that Lyons was engaged in illegal activity at the time.  The website was a legal news oriented website and the numerical notations were nothing more than a calculation of either an asset or debt balance that had been adjusted based upon additional debit or credits.  (Exhibit 13).  More importantly, there is no correlation between the laptop and the notes.  Lyons' conduct in reviewing sports scores had no perceivable relationship to the large account balances.  There was no references to specific sports games or wagers.  By the same flawed logic, the Government could have seized his television set because Lyons was watching the Red Sox game at the time of his arrest.  Accordingly, both the seizure and subsequent search of the laptop violated Lyons Fourth Amendment rights.

## V.  CONCLUSION

Based on the foregoing arguments and authorities, the Defendant respectfully urges that this Honorable Court conduct a *Franks* hearing on the instant motion and suppress the evidence seized from the unlawful searches of 192 Hale, the Audi, Lyons and the laptop and any other evidence obtained in violation of the Defendant's constitutional rights.

Respectfully submitted,

Peter Charles Horstmann, Esquire
BBO #556377
PARTRIDGE, ANKNER & HORSTMANN
200 Berkeley Street, 16th Floor
Boston, Massachusetts 02116
(617) 859-9999

## CERTIFICATE OF SERVICE

I, Peter Charles Horstmann, Esquire, hereby certify that on this 3rd day of January, 2011, a copy of the foregoing motion was served electronically upon Fred M. Wyshak and Robert Fisher, Assistant United States Attorneys, United States Attorneys Office, One Courthouse Way, Boston, MA 02210

Peter Charles Horstmann, Esquire

31